# IN THE UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **DOUGLAS DODSON, RICHARD LITTLE, JASPER VICK, ET AL,** | ) ) ) | |
| **PLAINTIFFS,** | ) ) | **CIVIL ACTION NO.:** |
| **V.** | ) ) | **3:17-CV-00048** |
| **CORECIVIC, FORMERLY d/b/a CORRECTIONS CORPORATION OF AMERICA and THE TENNESSEE DEPARTMENT OF CORRECTION** | ) ) ) ) ) ) ) | |
| **and TENNESSEE DEPARTMENT OF CORRECTION COMMISSIONER TONY PARKER** | ) ) ) ) ) | |
| **in his Official Capacity** | ) ) | |
| **DEFENDANTS.** | ) ) ) | |

## AMENDED CLASS ACTION COMPLAINT

## I.      INTRODUCTION

1.      The plaintiffs and the proposed class are incarcerated in the Tennessee Department of Corrections ("TDOC") and housed at Trousdale Turner Correctional Facility ("Trousdale Turner") in Hartsville, TN, a private prison owned and operated by CoreCivic, an entity formerly doing business as Corrections Corporation of

America ("CCA"). The plaintiffs and the proposed class are persons with insulin-dependent diabetes and require blood sugar monitoring and insulin administration in coordination with regular mealtimes in order to survive. They are entirely dependent upon Defendants TDOC, Parker, and CCA to provide them with access to basic diabetes care. However, they have been, and continue to be, deprived of access to basic diabetes care while incarcerated at Trousdale Turner Correctional Facility.

2.     Defendant TDOC and Defendant Parker, who is sued only in his official capacity as the head of the Department, have denied the Plaintiffs accommodation for their disability as required by Section 504 of the Rehabilitation Act and Title II of the Americans with Disabilities Act by assigning them to incarceration at Trousdale Turner, where, due to understaffing and undertraining, reasonable accommodations for persons with insulin-dependent diabetes are either not available or are routinely denied.

3.     Defendant CCA has subjected the plaintiffs and the plaintiff class to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments by implementing policies and practices, including understaffing and undertraining, which manifest deliberate indifference to the plaintiffs' serious medical needs, resulting in denial of access to basic diabetes care and serious physical injury to the

2

plaintiffs and the proposed class, constituting cruel and unusual punishment in violation of the Eighth Amendment.

4.     This is an action for declaratory and injunctive relief to redress the deprivation under color of state law of rights secured by the Eighth and Fourteenth Amendments to the U.S. Constitution via 42 U.S.C. § 1983 ("Section 1983"), Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131-12134 ("Title II"), and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 et seq ("Section 504").

5.     Plaintiffs, on behalf of themselves and the class they seek to represent, seek an injunction preventing Defendants TDOC and Parker from assigning persons with insulin-dependent diabetes to Trousdale Turner and requiring that all persons with insulin-dependent diabetes presently incarcerated at Trousdale Turner be transferred to other diabetic compliant facilities until such time as CCA implements the permanent relief sought from it in this lawsuit, namely, the maintenance of appropriate staffing levels and training to ensure that inmates have access to basic diabetes care in coordination with regular mealtimes. Plaintiffs seek permanent injunctive relief requiring Defendant CCA to remedy the conditions constituting cruel and unusual punishment and requiring Defendant TDOC to assign diabetic prisoners only to facilities where reasonable accommodations for their disabilities are available and provided. Finally, Plaintiffs seek a permanent injunction requiring the

3

implementation of independent monitoring sufficient to ensure that the serious medical needs of persons with insulin dependent diabetes at Trousdale Turner are being met and that persons with insulin-dependent diabetes are provided reasonable accommodations, including access to basic diabetes care.

## II.     JURISDICTION, VENUE AND ADMINISTRATIVE PREREQUISITES

6.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§ 1331 and 1343. Plaintiffs seek declaratory and injunctive relief under 28 USC §§ 1342, 2201 and 2202, 29 U.S.C. § 749a, and 42 U.S.C. §§ 1983 and 12133.  Venue is proper in the Middle District of Tennessee Nashville Division under 28 U.S.C. §1391(b).

7.     Plaintiffs have complied with all requirements of the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a) in that they have exhausted their administrative remedies and all appeals that were available. To the extent that administrative remedies remain unexhausted, Plaintiffs are entitled to a injunctive relief while they continue to exhaust administrative grievance procedures.

## III.    PARTIES

8.     Plaintiff Douglas Dodson has been an insulin-dependent Type 1 Diabetic since 2007. He is currently incarcerated at Trousdale Turner Correctional Center in Hartsville, TN.

Case 3:17-cv-00048   Document 55   Filed 09/14/17   Page 4 of 34 PageID #: 375

9.   Plaintiff Richard Little is an insulin-dependant Type II diabetic. He is currently incarcerated at Trousdale Turner Correctional Center in Hartsville, TN.

10.   Plaintiff Jasper Vick has been insulin dependent since 2010. He is currently incarcerated at Trousdale Turner Correctional Center in Hartsville, TN.

11.   Plaintiffs John Young and Edward Judd are inmates with insulin-dependent diabetes who have been, or may in the future be, housed  at Trousdale Turner Correctional Center in Hartsville, TN.

12.   The Defendant, CoreCivic, previously doing business as Corrections Corporation of America, ("CCA"), is a private Real Estate Investment Trust which owns and operates the Trousdale Turner Prison under contract with the State Department of Correction, housing prisoners sentenced to confinement in the Department of Correction. As such, CCA performs a public function traditionally reserved to the state and is therefore subject to suit under 42 U.S.C. § 1983.

13.   The Defendant, Tennessee State Department of Correction ("TDOC"), is a recipient of federal funds through numerous federal grants and programs, including grants to states for workplace and community transition training for incarcerated individuals. It therefore constitutes a "program or activity receiving Federal financial assistance" as that phrase is used in Section 504.

5

14.     The Defendant, Tennessee State Department of Correction ("TDOC"), is also a "public entity" providing services, programs, or activities as those terms are used by Title II of the ADA and is subject to suit for injunctive relief under that statute. Plaintiffs seek only injunctive relief, not damages, so TDOC is not immune from suit. In addition, Congress has validly abrogated TDOC's sovereign immunity under Title II in regard to the allegations at issue in this lawsuit because TDOC's conduct independently violates the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment Guarantee of substantive due process.

15.     CCA is an "instrumentality" of the Tennessee Department of Corrections as that term is defined in Title II of the ADA, 42 U.S.C. § 12131 (1)(B). This is so because, as stated above, the Department of Corrections, a state entity, is subject to Title II and obligated to provide reasonable accommodations to disabled individuals in its custody. CCA is the instrumentality through which such accommodations must be provided, if they are provided at all, to prisoners at CCA's Trousdale Turner Correctional Center. Accordingly, CCA is subject to suit under Title II of the ADA.

16.     Individual Defendant TDOC Commissioner Tony Parker ("Commissioner Parker") is sued in his official capacity and as the head of a "public entity" providing services, programs, or activities as those terms are used by Title II and Section 504.

## IV.     CLASS ACTION ALLEGATIONS

6

17.     Plaintiffs seek class certification of all claims pursuant to Federal Rule of Civil Procedure 23(a), (b)(1), and (b)(2). The Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

18.     The class is defined as persons with insulin-dependent diabetes (Type 1 or insulin dependent Type 2) who are, who have been, or who in the future may become, housed at Trousdale Turner correctional facility.

19.     The class is so numerous that joinder of all members is impracticable. Upwards of sixty (60) persons with Type 1 or insulin-dependent Type 2 diabetes are currently housed at Trousdale Turner Correctional Facility. The Plaintiff class members are readily identifiable using records maintained in the regular course of business by Defendants TDOC and CCA.

20.     There are questions of law and fact common to the proposed class. These common questions include whether Defendant CCA has a policy or practice of maintaining staffing levels insufficient to ensure that inmates have access to basic diabetes care in coordination with regular mealtimes.

21.     Another common question is whether Defendant CCA fails to train its corrections officers adequately in regard to the medical needs of insulin-dependent diabetic inmates in deliberate indifference to the obvious need for such training, and

7

whether it maintains its understaffing and lack of training in deliberate indifference to the serious medical needs of its insulin-dependent diabetic inmates.

22.     Another common question is whether, as a result of Defendant CCA's policy and practice of understaffing and undertraining, corrections officers and medical staff are unable to provide class members with access to basic diabetes care, including blood sugar checks and insulin administration, in coordination with regular mealtimes according to the schedule set by medical staff and displayed on the card the inmate carries.

23.     The claims of the named Plaintiffs are typical of those of the proposed class, as their claims arise from the same policies, practices, acts, and omissions as those of the Plaintiff class. The named Plaintiffs' claims are based on the same theory as the claims of the class. Each named Plaintiff has been injured as a result of Defendants' actions addressed in this lawsuit in the same way as the other members of the proposed class.

24.     The named representatives will fairly and adequately protect the interests of the class. The named Plaintiffs do not have any interests antagonistic to the interests of the class. The named plaintiffs, on behalf of the proposed class, seek to enjoin the unlawful acts and omissions of Defendants. Finally, the named Plaintiffs are

represented by counsel experienced in civil rights litigation, prisoners' rights litigation, and complex class action litigation.

25. This action is maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(1) because the number of current members of the proposed class is in excess of sixty (60), and prosecution of separate actions by individuals seeking the same injunctive relief would create a risk of inconsistent and varying adjudications, with the risk of establishing incompatible standards for the party opposing the class. The prosecution of separate actions by individual members could result in adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

26. This action is also maintainable as a class action pursuant to Fed. R. Civ. P. 23(b)(2). Final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole, as Plaintiffs seek an injunction to prevent Defendant TDOC from assigning persons with diabetes to Trousdale Turner, and assuring that all persons with insulin-dependent diabetes presently assigned to Trousdale Turner are transferred to other facilities, until such time as CCA implements the permanent relief sought from it in this lawsuit, namely, the maintenance of appropriate staffing levels and training to ensure that inmates have access to basic diabetes care in

9

coordination with regular mealtimes in accordance with the directions of medical staff.

27.    Certification under Fed. R. Civ. P. 23(b)(2) is further appropriate because Plaintiffs seek permanent injunctive relief requiring Defendant CCA to remedy the conditions constituting cruel and unusual punishment and requiring Defendant TDOC to assign diabetic prisoners only to facilities where reasonable accommodations for their disabilities are provided in accordance with Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

28.    Finally, certification under Fed. R. Civ. P. 23(b)(2) is appropriate because Plaintiffs seek a permanent injunction requiring the implementation of independent monitoring sufficient to ensure that the medical needs of persons with insulin-dependent diabetes at Trousdale Turner are being met and that persons with insulin-dependent diabetes are provided with reasonable accommodations including access to basic diabetes care in coordination with regular mealtimes in accordance with the directions of medical staff as required by Title II, Section 504, and the Eighth and Fourteenth Amendments of the United States Constitution.

29.    The injuries of each named Plaintiff and the Plaintiff class are actual, imminent, and ongoing, as they continue to be denied basic diabetes care. To the extent any named representative is transferred to another facility pursuant to the relief requested

10

in this lawsuit or for other reasons, that plaintiff will continue to have standing and will continue to be an adequate class representative in the absence of the permanent relief this lawsuit seeks. Because Tennessee law dictates that "[a]ny inmate sentenced to confinement in the department shall be legally eligible to be incarcerated in a facility in which a prison contractor is providing correctional services," Tenn. Code § 41-24-103(c), each named Plaintiff will continue to face a real and immediate threat of incarceration at Trousdale Turner and of future injury and will continue to have standing to pursue injunctive relief.

## V.    FACTUAL ALLEGATIONS

### A.    Trousdale Turner Correctional Facility and the Corrections Corporation of America.

30.    Trousdale Turner Correctional Facility ("Trousdale Turner") opened in January, 2016 as a newly constructed facility located in Hartsville, Tennessee.

31.    Trousdale Turner is owned and operated by CoreCivic, a company formerly doing business as Corrections Corporation of America ("CCA"), a for-profit prison owner and operator of private prisons nationwide, under a contract with the Tennessee Department of Correction ("TDOC").

32.    Trousdale Turner is a medium security facility with a capacity of 2552 male inmates.

11

33.     CCA is a publicly traded real estate investment trust. CCA manages or owns

66 correctional and detention facilities with a capacity of approximately 90,000 beds

in 19 states and the District of Columbia. In 2015, CCA reported a total revenue of

$1.79 billion.

34.     In Tennessee, in addition to the Trousdale Turner facility, CCA owns and

operates the Whiteville Correctional Facility. Pursuant to contractual agreements,

CCA manages the South Central Correctional Center, the Metro-Davidson County

Detention Facility and the Hardeman County Correctional Facility.

35.     In conjunction with federal and local governments, CCA also owns and

operates the West Tennessee Detention Facility in Mason, Tennessee, and manages

the Silverdale Detention Facilities in Chattanooga, Tennessee, which house federal

and local inmate and detainee populations.

### B.     CCA's Policy and Practice of Understaffing and Undertraining.

36.     In order to maximize profits, CCA has a policy and practice of reducing

staffing, sometimes even below the levels called for in its contracts with entities such

as the Tennessee Department of Corrections.

37.     Since its opening, Trousdale Turner has been understaffed, and staffing has

been insufficient to ensure safe and efficient inmate movement within the facility. For

instance, as a result of understaffing of corrections officers, inmates are not allowed

12

to use the exercise yard or to visit the "chow hall" for meals because CCA lacks sufficient numbers of corrections officers and other correctional staff to safely and efficiently move inmates in large groups according to a regular schedule.

38.     Similarly, the medical clinic at the prison is understaffed. Although the facility has a capacity of 2552 inmates, currently there is no medical doctor on staff, as the physician previously assigned to the prison resigned and has not been replaced. The current medical staff consists of four (4) nurses and two (2) nurse practitioner.

39.     Trousdale Turner does not employ a nutritionist.

40.     This understaffing is the result of CCA's policy and practice of minimizing staffing in order to cut costs and maximize profits.

41.     As a result of CAA's policy and practice of understaffing, Defendant CCA is often unable to provide persons with insulin-dependent diabetes with access to basic diabetes care, including blood sugar checks and insulin administration coordinated with regular mealtimes and a diabetic appropriate diet.

42.     In addition, Trousale Turner's corrections staff consists largely of corrections officers with no previous experience in corrections. Defendant CCA does not adequately train corrections officers regarding the need to provide diabetic prisoners with access to basic diabetes care, including blood sugar checks and insulin

13

administration coordinated with regular mealtimes, despite the obvious and repeatedly demonstrated need for such training.

43. As a result of Defendant's policy and practice of understaffing and undertraining, corrections officers are not adequately trained in the need to provide persons with insulin-dependent diabetes with access to basic diabetes care, including blood sugar checks and insulin administration coordinated with regular mealtimes.

44. CCA fails to train its corrections officers adequately in the need to provide persons with insulin-dependent diabetes with access to basic diabetes care, including blood sugar checks and insulin administration coordinated with regular mealtimes, despite knowing of the need for such training, and maintains its understaffing in deliberate indifference of the serious medical needs of its insulin-dependent diabetic inmates.

### C.    Diabetes Mellitus.

45. Trousdale Turner facility houses upwards of sixty prisoners who have been diagnosed with Type 1 or Type 2 diabetes and who require insulin injections.

46. In type 1 diabetes, the pancreas stops making insulin or makes only a tiny amount. Type 1 develops when the body's immune system destroys beta cells in the pancreas, the only cells in the body that make insulin. Thus, the body is no longer

14

able to produce significant amounts of insulin, and a person with type 1 diabetes must receive insulin from an outside source in order to survive.

47.     Insulin is typically administered through injections or use of an insulin pump, a small mechanical device that administers insulin through a tube into a permanent injection site. Failure to administer insulin in a timely manner to a person with type 1 diabetes can lead to diabetic ketoacidosis (DKA), a potentially fatal condition caused by severely elevated blood glucose levels. Similarly, failure to appropriately monitor blood sugar levels, or delayed access to food after insulin is administered, can lead to a drastic drop in blood sugar levels resulting in the diabetic losing consciousness, going into a coma or dying.

48.     Type 2 diabetes is by far the most common type of diabetes—approximately 95% of people with diabetes have type 2 diabetes. In type 2 diabetes, the body retains the ability to make insulin, but the amount of insulin it does make does not adequately serve the body's needs. It is generally believed that in people with type 2 diabetes the body's cells cannot recognize insulin or use it as effectively as in people without diabetes (a condition known as insulin resistance). Generally over time the strain on the pancreas will decrease its ability to produce insulin and will cause blood glucose levels to rise. Some people with type 2, particularly in the early stages of the disease, can control their diabetes solely through diet and exercise. Treatment may then

progress to use of oral medications. Finally, as the disease progresses, some people with type 2 diabetes may receive insulin administrations as frequently as a person with type 1 diabetes. However, people with type 2 diabetes, even those who use insulin, have a much lower chance of experiencing deadly diabetic ketoacidosis (DKA) than a person with type 1 diabetes.

49.    Insulin and oral medications which lower blood glucose levels are used to treat diabetes. All types of insulin and some oral medications can lower blood glucose levels too much, leading to a potentially dangerous condition known as hypoglycemia (low blood glucose levels). The medical definition of hypoglycemia is a blood sugar reading of 70 mg/dL or below. Symptoms of mild to moderate hypoglycemia include tremors, sweating, lightheadedness, irritability, confusion, and drowsiness.

50.    Hypoglycemia usually can be treated easily and effectively by consuming a ready source of glucose such as fruit juice. If it is not treated promptly, however, hypoglycemia can become severe and potentially life-threatening. Symptoms of severe hypoglycemia include inability to swallow, convulsions or unconsciousness.

51.    All people with type 1 diabetes, and some people with type 2 (those who are taking insulin or oral medications which lower blood glucose levels) will experience hypoglycemia.

52.    Hyperglycemia (high blood glucose) can cause a host of symptoms and can also eventually lead to more severe consequences.

53.    The symptoms of mild to moderate hyperglycemia include hunger, thirst and dehydration, headache, nausea, fatigue, blurry vision, frequent urination, and itchy and dry skin. Individuals with hyperglycemia can also have fruity smelling breath, which can be mistaken for the smell of alcohol. In addition to these short-term consequences of acute hyperglycemia, chronic high blood glucose levels can cause a number of very serious long-term complications, such as nerve damage, heart disease, blindness, kidney failure, stroke, and death. Thus, in situations where a person is unable to take medication to address high blood glucose for an extended period of time, their chances of experiencing these health complications rises.

54.    If a person who needs insulin is not able to take that medication for a period ranging from several hours to several days, he or she can experience diabetic ketoacidosis (DKA). Type 1 diabetes has a greatly increased risk of DKA as compared to type 2 diabetes. DKA is a life-threatening and often deadly consequence of a shortage of insulin. The body begins to burn fatty acids for energy since it cannot use the glucose without insulin. The byproduct of breaking down fatty acids are ketone bodies, which render the blood acidic. Diabetic ketoacidosis, if left untreated,

will eventually result in death. Diabetic ketoacidosis requires immediate hospitalization, often in the intensive care unit.

### D. Diabetic Care at Trousdale Turner Correctional Facility.

55. At Trousdale Turner, persons with insulin-dependent diabetes are provided with ID cards identifying them to corrections officers and medical staff as diabetics.

56. Due to underfunding and understaffing, Trousdale Turner does not have a sufficient medical staff. As stated above, the current staff consists of four (4) nurses, two (2) nurse practitioners, and currently no physician.

57. The medical staff has assigned each insulin dependent diabetic inmate a schedule of times when the inmate is supposed to receive insulin and/or blood sugar checks. This schedule of times is printed on a card that the inmate carries with him.

58. The schedule of blood sugar checks and insulin administration set by the medical staff is intended to be coordinated with regular mealtimes, as persons with insulin-dependent diabetes must check blood sugar and take fast-acting insulin before eating.

59. As stated above, Trousdale Turner employs no nutritionist due to its policies of understaffing and underfunding. This means that meals are unpredictable in timing and content for persons with insulin-dependent diabetes, contrary to medical directions.

18

60.     Further, as a result of Defendant's policy of understaffing and undertraining, mealtimes have been irregular at Trousdale Turner since the facility opened in 2016, and are often not timed by corrections staff to allow coordination with access to basic diabetes care, including blood sugar checks and insulin administration.

61.     This leads to insulin-dependent being forced to eat diabetic inappropriate meals without first being allowed to check blood sugar or take insulin, or being required to forgo blood sugar checks or insulin entirely.

62.     Tazarius Leach, an inmate with insulin-dependent diabetes, states, "I have been at Trousdale Prison since Jan. 7th. I been having problems getting Insulin. Some days I don't receive insulin at all or on time." Plaintiff Richard little states that "With all the problems that go by on a daily basis and as a pill and insulin diabetic I have been denied my diabetes shot and mental health medications so many times that I stopped counting." Plaintiff Douglas Dodson states, "Well to start with it was a few days in February that all the diabetics went without any insulin..."

63.     CCA has no dietician on staff at Trousdale Turner. As a result, diabetic inmates are denied access to diabetic appropriate nutrition, contrary to the direction of medical staff.

64.    The understaffing and underfunding of the medical department also results in inmates being denied access to basic diabetes care because the medical department lacks staff or equipment to provide such care when needed.

65.    Inmates have been on lockdown numerous times since the opening of the Trousdale Turner facility in January, 2016, sometimes being required to remain in their cells for three weeks or more without access to showers or exercise facilities.

66.    Lockdowns at Trousdale Turner have occurred not just for disciplinary purposes, but also because, as a result of CCA's policy and practice of understaffing, the facility lacks adequate staffing to enable inmate movement within the facility.

67.    During periods of lockdown or at other times of restricted inmate movement, inmates must rely on corrections staff to provide access to medical staff for diabetic care. During lockdowns or at other times of restricted movement, inmates must be "called" by corrections officers or medical staff for basic diabetes care, including blood sugar checks and insulin administration.

68.    During periods of lockdown, or because it is frequently not possible due to understaffing for corrections officers to safely move inmates in large numbers, inmates are given meals on trays in their cells rather than in the "chow hall" or cafeteria. Meals are provided at irregular and often unpredictable times and are often not diabetic appropriate despite medical directions for a diabetic appropriate diet.

69.     At such times, inmates are frequently forced to eat their meals and only then, sometimes two to three hours after eating, allowed to go for blood sugar checks or insulin injections. This occurred, for instance, between August 29, 2016 and September 18, 2016 and has recurred several times, with a high likelihood of recurrence in the future. Such unconscionable delay in receiving basic diabetes care is the functional equivalent of receiving no care at all and is the direct result of Defendant CCA's policy or practice of understaffing and undertraining.

70.     Dodson states that as of September, 2016, "We have been on ... facility lock down for the biggest part of September and just about everyday for the lunch, 12:00 and evening at 4:30 acute check we have been forced to eat our meals and wait 2 to 3 hours and then go have our blood sugars checked..." Dodson further states, "on 9-13-2016 and 9-14-2016 we were not even called for the 4:30 pm evening diabetic call, so ... no diabetic received any insulin whatsoever for these evening diabetic calls."

71.     According to Dodson, "from 8-29-2016 to 9-18-2016 while on a facility lockdown all diabetics were forced to eat our evening meals without being able to get our blood sugar checked and receiving our insulin, it would be 2 or 3 hours before we were called to get it if we even got called."

72.    Sometimes, diabetic call does not occur due to understaffing or as a result of undertraining. On such occasions inmates are not allowed to check blood sugar or receive insulin in coordination with meals and are completely denied access to basic diabetes care as a result of Defendant's policy of understaffing or failure to train.

73.    At such times, as a result of deliberate indifference and the policies of understaffing and undertraining, Defendant CCA frequently and routinely denies inmates access to basic diabetes care including blood sugar checks and insulin administration in coordination with regular mealtimes.

74.    As a result of being denied basic diabetes care, the plaintiffs and the Plaintiff class have suffered, and continue to suffer, ongoing physical injuries.

75.    Plaintiff Douglas Dodson has experienced numerous diabetes-related complications as a result of being denied access to basic diabetes care, including blood sugar checks and insulin. These complications include consistently high blood sugar, DKA, diabetic neuropathy, and other serious medical complications, including life threatening fluctuations in blood sugar levels, while incarcerated at Trousdale Turner. Dodson has filed grievances but has received no responses.

76.    Tazarius Leach has experienced numerous diabetes-related complications as a result of being denied access to basic diabetes care, including blood sugar checks

22

and insulin. These complications include consistently high blood sugar, DKA, degraded vision, and diabetic neuropathy, and other serious diabetes complications.

77. Plaintiff Richard Little has experienced numerous diabetes-related complications as a result of being denied access to basic diabetes care, including blood sugar checks and insulin. These complications include consistently high blood sugar, DKA, degraded vision, and diabetic neuropathy, and other serious diabetes complications.

78. Plaintiff Jasper Vick has experienced numerous diabetes-related complications as a result of being denied access to basic diabetes care, including blood sugar checks and insulin. These complications include, degraded vision, and diabetic neuropathy, and other serious diabetes complications.

## VI. Count I – Failure to Accommodate and Discrimination on the Basis of Disability Resulting in Physical Injury under Title II of the ADA and Section 504 of the Rehabilitation Act.

79. Plaintiffs re-allege and incorporate by reference paragraphs 1-79 above with the same force and effect as if fully set out in specific detail below.

80. Plaintiffs bring this Count against Defendant CCA (Title II) and Defendant DOC (Section 504). Defendant CCA is a "instrumentality" of the Tennessee Department of Corrections as that term is defined in Title II of the ADA, 42 U.S.C. § 12131 (1)(B). The Tennessee Department of Correction is a "program or activity

receiving Federal financial assistance" as that phrase is used in Section 504. It is also a "public entity" providing services, programs, or activities as those terms are used by Title II of the ADA and is subject to suit under that statute.

81.　Defendant CCA is sued for injunctive relief under Title II. Defendant TDOC is sued for injunctive relief under Section 504 and under Title II. The conduct alleged in this complaint independently violates the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's guarantee of substantive due process.

82.　As stated, Plaintiffs are qualified individuals with disabilities pursuant to the ADA and § 504, and Plaintiffs are qualified to received Defendants' services. Plaintiffs have a condition, diabetes, which substantially limits at least one major life activity and/or has a history of a disability.  42 U.S.C. § 12102. Plaintiffs' diabetes is a physical impairment to a major life activity because it is a physical condition affecting Plaintiffs' the digestive, hemic and endocrine systems.　In particular, Plaintiffs' diabetes is an impairment that places a substantial limitation on his endocrine function. Plaintiffs' diabetes substantially limits his major life activity of eating and caring for one's self.　Plaintiffs may not eat whatever they please because they risk severe bodily reactions if they disregard blood sugar readings or fail to adjust insulin property in coordination with meals.

24

83.    Plaintiffs require reasonable accommodations to Defendant's programs, services, and activities in order to manage their diabetes. These accommodations include providing blood sugar checks and insulin administration according to the schedule set by their physicians; regular mealtimes; the opportunity to exercise; and access to medical treatment and equipment.

84.    Defendants have intentionally with deliberate indifference discriminated against Plaintiffs and have limited, segregated, excluded, treated, and classified Plaintiffs in a way which adversely affects their opportunities and denies them receipt of services and benefits of defendant public entities because of their disabilities. 42 U.S.C. § 12132; 29 U.S.C. 794.

85.    Defendants have administered and applied their policies, practices and procedures in a method that discriminated against Plaintiffs on the basis of disability and denied them the receipt of services and benefits of the defendants.

86.    Plaintiffs sought reasonable accommodations, including access to blood sugar checks and insulin administration according to the schedules set by their doctors, and Defendants denied such requests.  Accommodating Plaintiff would not have caused undue hardship to defendants.

25

87.     As a direct and foreseeable result of these Defendants' violations of Plaintiff's federally protected rights, Plaintiffs have suffered and will continue to suffer permanent physical injury.

88.     Plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for declaratory judgment and injunctive relief is their only means of securing adequate relief.

89.     Plaintiffs are now suffering, and will continue to suffer irreparable injury from Defendants' unlawful conduct as set forth herein unless enjoined by this Court.

## VII.   Count II – Deliberate Indifference to Serious Medical Needs Resulting in Physical Injury in Violation of the Eighth Amendment's Prohibition of Cruel and Unusual Punishment and Fourteenth Amendment Substantive Due Process.

90.     Plaintiffs re-allege and incorporate by reference paragraphs 1-90 above with the same force and effect as if fully set out in specific detail below.

91.     Plaintiffs brings this Count against Defendant CCA.

92.     Defendant CCA's actions as described above were taken under color of state law, and were the result of an official policy or custom manifesting deliberate indifference to Plaintiff's constitutional rights and/or a failure to train.

93.     Defendant CCA has a policy or practice of minimizing staffing in order to reduce costs and maximize profits. This policy results in staffing levels that are insufficient to ensure that inmates have access to basic diabetes care in coordination

26

with regular mealtimes. As a result of Defendant CCA's policy and practice of understaffing, corrections officers and medical staff are often unable to provide persons with insulin-dependent diabetes with access to basic diabetes care and equipment, including blood sugar checks and insulin administration coordinated with regular mealtimes.

94. In addition, Defendant CCA does not adequately train corrections officers regarding the medical needs of diabetic prisoners despite the obvious and demonstrated need for such training. The need for training is obvious because of the numerous grievances Defendant has received regarding denial of basic diabetes care as a result of guards believing that it is okay to, for instance, skip medications call for diabetics if they are too busy. As a result of Defendant CCA's policy and practice of undertraining, corrections officers are not adequately trained in the need to provide persons with insulin-dependent diabetes with access to insulin and blood sugar checks coordinated with mealtimes according to the schedule set by medical staff.

95. Defendant CCA fails to train its corrections officers adequately in regard to the medical needs of insulin-dependent diabetic inmates despite knowing of the need for such training, and maintains its understaffing in deliberate indifference of the serious medical needs of its insulin-dependent diabetic inmates, despite knowing that persons with insulin diabetes are being deprived of essential care in its Trousdale Turner

27

facility. Defendant CCA has received numerous grievances regarding the denial of basic diabetes care at Trousdale Turner but has failed to take remedial action.

96.    The failure to train occurred despite a pattern of constitutional violations or such a high likelihood of a constitutional violation that the need to train should have been obvious.

97.    Defendant CCA's actions were taken with deliberate indifference to the Plaintiffs' serious medical needs and with deliberate indifference to Plaintiffs' clearly established Constitutionally protected rights to adequate medical care.

98.    These Defendants' actions were intentional and/or resulted from a reckless disregard for the substantial risk posed by the Plaintiffs' serious medical condition amounting to deliberate indifference that "shocks the conscience."

99.    As a result of Defendants' actions, Plaintiffs were deprived of fundamental rights guaranteed by the United States Constitution, including the right to adequate medical care for their serious medical needs while in the custody of the state.

100.    The Defendants' actions as described above violated the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's guarantee of substantive due process.

101. As a direct and foreseeable result of these Defendants' violations of Plaintiff's Eighth and Fourteenth Amendment rights, Plaintiffs have suffered and will continue to suffer permanent physical injury.

102. Plaintiffs have no plain, adequate or complete remedy at law to redress the wrongs alleged herein and this suit for declaratory judgment and injunctive relief is their only means of securing adequate relief.

103. Plaintiffs are now suffering, and will continue to suffer irreparable injury from Defendants' unlawful conduct as set forth herein unless enjoined by this Court.

## IX. PRAYER FOR RELIEF

WHEREFORE, the named Plaintiffs and the class they represent respectfully pray that this Court assume jurisdiction of this action and grant them the following relief:

A. Declare that this suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(1) and (2).

B. Issue a declaratory judgment that the policies, practices, procedures, conditions and customs of Defendants are violative of the rights of Plaintiff as secured by the Eighth and Fourteenth Amendments of the U.S. Constitution, Title II of the ADA, and Section 504 of the Rehabilitation Act.

C.      Grant Plaintiffs and the plaintiff class a permanent injunction enjoining Defendants, their agents, successors, employees, attorneys and those acting in concert with Defendants and at Defendants' request from continuing to violate the Eighth and Fourteenth Amendments of the U.S. Constitution, Title II of the ADA, and Section 504 of the Rehabilitation Act as set forth above.

D.      Order Defendants TDOC and Parker, their agents, employees, officials, and all persons acting in concert with them under the color of state law to cease assigning persons with insulin-dependent diabetes to Trousdale Turner Correctional facility until such time as CCA effectively implements the permanent relief sought from it in this lawsuit;

E.      Order Defendants TDOC and Parker, their agents, employees, officials, and all persons acting in concert with them under the color of state law to immediately transfer all persons with insulin-dependent diabetes presently incarcerated at Trousdale Turner Correctional facility to other facilities where reasonable accommodations, including access to basic diabetes care in coordination with regular mealtimes and a diabetic appropriate diet, and a full medical staff adequate to meet the needs of persons with insulin-dependent diabetes, are available and provided until such time as CCA effectively implements the permanent relief sought from it in this lawsuit;

F.     Order Defendant CCA, its agents, employees, officials, and all persons acting in concert with it under the color of state law to implement a plan for immediately increasing, and in the future maintaining, staffing at numerical levels sufficient to ensure that inmates have access to basic diabetes care in coordination with regular mealtimes in accordance with the direction of medical staff, including hiring a nutritionist, increasing medical staffing, and increasing corrections officer staffing;

G.     Order Defendant CCA, its agents, employees, officials, and all persons acting in concert with it under the color of state law to implement a plan for and implement training of medical staff, corrections staff, and others with inmate contact to ensure that insulin-dependent diabetic inmates have access to basic diabetes care;

H.     Order Defendant CCA to take whatever steps may otherwise be necessary remedy the conditions constituting cruel and unusual punishment as detailed above;

I.     Order Defendant TDOC to assign diabetic prisoners only to facilities where reasonable accommodations for their disabilities are available and provided in accordance with Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act; and

31

J. Order Defendants TDOC and CCA to implement and allow independent monitoring by a monitor with appropriate medical training and expertise approved by plaintiffs sufficient to ensure that the medical needs of persons with insulin dependent diabetes at Trousdale Turner are being met and that persons with insulin-dependent diabetes are provided with reasonable accommodations as required by Title II, Section 504, and the Eighth and Fourteenth Amendments of the United States Constitution, including access to basic diabetes care in coordination with regular mealtimes according to the directions of medical staff.

K. Award Plaintiffs the costs of this suit, including reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. §1988 and applicable law;

L. Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court, and there is a reasonable assurance that Defendants will continue to comply in the future absent continuing jurisdiction; and

M. Award such other and further relief as the Court deems just and proper.

Respectfully submitted,

/s/ Joshua D. Wilson
Joshua D. Wilson (TN Bar No. 031486)
WIGGINS, CHILDS, PANTAZIS, FISHER, & GOLDFARB, LLC.
5214 Maryland Way, Suite 402
Brentwood, TN 37027

32

(615) 964-5215
jwilson@wigginschilds.com

Jon C. Goldfarb (to be admitted *pro hac vice*)
L. William Smith (to be admitted *pro hac vice*)
WIGGINS, CHILDS, PANTAZIS, FISHER
& GOLDFARB, LLC.
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
Telephone No.: (205) 314-0500
Facsimile No.: (205) 254-1500
jcg@wigginschilds.com
lws@wigginschilds.com
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on the 14th day of September, 2017, I filed this document with the Clerk of the Court, causing electronic notice to be sent to the following attorneys of record:

Erin Palmer Polly
Joseph F. Welborn, III
Paige M. Ayres
Butler Snow LLP (Nashville)
The Pinnacle at Symphony Place
150 Third Avenue South, Suite 1600
Nashville, TN 37201
(615) 651-6700
Erin.Polly@butlersnow.com
Joe.Welborn@butlersnow.com
Paige.Nutini@butlersnow.com

Kyle V. Miller
Butler Snow LLP (Ridgeland, MS)
P O Box 6010
1020 Highland Colony Parkway

33

Suite 1400
Ridgeland, MS 39158-6010
(601) 948-5711
Fax: (601) 985-4500
kyle.miller@butlersnow.com

Jennifer L. Brenner
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202
(615) 532-2500
jennifer.brenner@ag.tn.gov

Torrey Samson
Tennessee Attorney General's Office
P O Box 20207
Nashville, TN 37202-0207
(615) 741-6820
Fax: (615) 532-2541
torrey.samson@ag.tn.gov

/s/ L. William Smith
Of Counsel
